## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**KALEIGH ANDREWS,**

     **Plaintiff,**

     **v.**                          **Case No.  23-CV-673**

**GENERAC POWER SYSTEMS, INC.,**

     **Defendant.**

---

## DECISION AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

---

Kaleigh Andrews sues her former employer, Generac Power Systems, Inc., alleging discrimination, failure to accommodate, and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, *et seq.* Generac has moved for summary judgment in its favor on Andrews' claims. (Docket # 17.) For the reasons further explained below, Generac's motion for summary judgment is granted. Andrews' complaint is dismissed.

## BACKGROUND FACTS

Andrews testified that she was diagnosed in 2012 with Bipolar II Disorder and in July 2020 with pyelonephritis.[1] (Declaration of Shannon D. McDonald ("McDonald Decl.") ¶ 4, Ex. B, Deposition of Kaleigh Andrews ("Andrews Dep.") at 50, 116, 119, 137, Docket # 26-2.) Andrews alleges that her Bipolar Disorder causes her to have racing thoughts, irritability, anxiety, and "word vomiting," and she experiences symptoms when

---

[1] Pyelonephritis is defined as "[i]nflammation of the renal parenchyma, calyces, and pelvis, particularly due to local bacterial infection." Pyelonephritis, Stedmans Medical Dictionary 742820. "A kidney infection is also called pyelonephritis." https://www.mayoclinic.org/diseases-conditions/kidney-infection/symptoms-causes/syc-20353387 (last visited Dec. 13, 2024).

something or someone triggers her. (Def's Proposed Findings of Fact ("DPFOF") ¶ 108, Docket # 18 and Pl.'s Resp to DPFOF ("Pl.'s Resp.") ¶ 108, Docket # 27.) Andrews alleges that her pyelonephritis is chronic and causes her pain, frequent and chronic urinary tract infections, night sweats, the need to sleep, water retention, and nausea. (DPFOF ¶ 117 and Pl.'s Resp. ¶ 117.)

Generac manufactures and offers a wide range of power equipment products, including portable, residential, commercial, and industrial power generators; residential and professional grade pressure washers; and water pumps. (DPFOF ¶ 2 and Pl.'s Resp. ¶ 2.) Generac is headquartered in Waukesha, Wisconsin, and has several manufacturing facilities, including in Whitewater, Wisconsin. (*Id.* ¶ 3.) Andrews was employed by Generac at its Whitewater facility from July 24, 2020, to October 16, 2020, as an Assembler I. (*Id.* ¶ 4.)

Christine Davis has held the position of Supervisor for Generac at its Whitewater facility since January 1, 2019 and supervised Andrews as a direct report during the entirety of Andrews' employment with Generac. (*Id.* ¶¶ 5–6.) Megan Yakich (f/k/a Megan Sponholtz) was a Machine Technician at the Whitewater facility from April 2020 until September 20, 2020, and became second shift Engine Line Team Lead from September 21, 2020, to June 19, 2022. (*Id.* ¶ 7.) Since June 20, 2022, Yakich has held the position of Supervisor at the Whitewater facility. (*Id.*) While she was Engine Line Team Lead, Yakich assisted Davis in overseeing the engine line and supervising the employees on the line, including through ensuring that operators had what they needed, covering roles for break relief, training employees, ensuring the engines were properly being built, and ensuring employees were working safely. (*Id.* ¶ 8.) Yakich performed leadership responsibilities with

regard to the engine line during the entirety of Andrews' employment, and formally became her Team Lead on September 21, 2020. (*Id.* ¶ 9.) Leticia Verduzco held the position of Human Resources Generalist at the Whitewater facility from March 2, 2020, through August 16, 2021. Before that, she held the position of Human Resources Representative from October 22, 2018, through March 1, 2020. (*Id.* ¶ 10.)

At all times relevant, Generac maintained policies prohibiting and addressing discrimination, harassment, and disability accommodations. (*Id.* ¶¶ 11–17.) Generac also maintained an attendance policy, which explains that regular attendance is an essential function of the job and is expected for all employees as part of acceptable performance and provides call-in procedures for employees. (*Id.* ¶ 18.) Generac maintained a Disciplinary policy and related procedures, which explain that Generac expects employees to conduct themselves in a professional, business-like manner and has established guidelines for attendance, absenteeism, and other disciplinary issues. (*Id.* ¶ 21.) Under Generac's Disciplinary policy, violations warranting immediate termination include inappropriate behavior, insubordination including refusal or failure to perform work assigned, leaving the plant without permission, violation of Company policy, and willful failure to observe safety rules. (*Id.* ¶ 22.) During the Covid-19 pandemic, Generac implemented certain additional safety measures to which it required its employees to adhere, including the mandatory use of face masks while inside a Generac facility. (DPFOF ¶ 20.) Andrews contends, however, that she observed several employees not wearing masks or safety glasses while at work including coworkers and her supervisor, Davis. (Pl.'s Resp. ¶ 20.)

Generac asks applicants and employees to self-identify themselves voluntarily and confidentially as members of certain protected categories, including an individual with a

3

disability. (DPFOF ¶ 24.) While Generac contends that it has always conducted this process online (*id.*), Andrews asserts that she completed the self-identification form in person, in writing; not on a computer (Pl's Resp. ¶ 24). Unless an employee of his or her own volition directly discloses any disability information to supervisors and Human Resources, any information disclosed in the self-identify form is hidden from these individuals. (DPFOF ¶ 25 and Pl.'s Resp. ¶ 25.)

In her position as Assembler I, Andrews worked on the engine line, building engines. (*Id.* ¶ 28.) Andrews was required to cross-train in multiple assembly areas and flex to other similar departments based on business necessity; follow established procedures, processes, and policies; demonstrate good attendance, quality, and attention to detail and all safety policies; effectively communicate in a team environment; and accept responsibility for her own actions. (*Id.* ¶ 29.) Generac asserts that the physical requirements of the Assembler I position included standing and regularly walking, stooping, crouching, bending, and reaching above the shoulders; and frequently lifting and/or moving up to 50 pounds unassisted and up to 100 pounds with assistance, waist high, up to 10 feet away. (DPFOF ¶ 30.) Andrews contends, however, that she was not required to lift up to 50 pounds in her position. (Pl.'s Resp. ¶ 30.)

At the Whitewater facility, there are approximately 20 to 30 different positions or stations on the engine line where Andrews worked, all of which perform some part in building engines. (DPFOF ¶ 33 and Pl.'s Resp. ¶ 33.) Cover, Wash, and Timing are among the stations on the engine line on which Andrews worked. (*Id.* ¶ 34.) Employees generally spend an entire shift in one position but may move from position to position during their employment, if not on a day-to-day or week-to-week basis. (*Id.* ¶ 35.) Andrews performed

4

most of her work at the Cover station. (*Id.* ¶ 37.) At the Cover station, there are two positions—the first individual operates the press, pressing a seal on the engine cover, which is then passed along the assembly line to the second individual, who attaches various parts to the engine cover on the rack. (*Id.* ¶ 38.) Andrews only ever performed the second position at the Cover station, routinely lifting engine covers that weighed approximately five pounds each, and never lifting more than 15 pounds. (*Id.* ¶ 39.)

The Wash station is the first station on the engine line, where individual parts of the engine are placed into baskets to be put through the wash. (*Id.* ¶ 40.) It is one of the closest stations to the restrooms—approximately 10 to 15 feet away, and no more than 30 seconds' walk. (*Id.*) Generac states that when the line is running at quick speed, two employees are assigned to the Wash station—the first individual collects the lighter parts (i.e., approximately 1 to 2 pounds, and never more than 5 pounds) and puts them into baskets, and the second individual places the heavier parts (i.e., approximately 5 to 6 pounds, but never more than 15 pounds) such as the engine block and cover into a basket. (DPFOF ¶ 41.) Andrews, however, asserts that while the Wash station was a two-person job, Generac assigned only Andrews to work the station. (Pl.'s Additional Proposed Findings of Fact ("PPFOF") ¶ 51, Docket # 25.) She further asserts that she was required to lift heavy parts repeatedly. (*Id.* ¶ 50.) The Timing station consists of lubricating and pushing timing gear into the engines, lifting equipment that weighs approximately the same as the parts required to be lifted at the Cover and Wash stations. (DPFOF ¶ 43 and Pl.'s Resp. ¶ 43.) Timing is a single-person position and constitutes one of the simpler tasks on the engine line—one routinely assigned to newer Assemblers. (*Id.* ¶ 44.)

5

In late September 2020, Generac notified Andrews and all others in her same position that everyone would need to begin working mandatory Saturdays, from 5:00 p.m. to 1:00 a.m. (*Id.* ¶ 45.) Andrews acknowledges that she informed Generac that she would be unable to work any Saturday for the next three months due to personal reasons unconnected to any alleged disabilities or medical conditions. (*Id.* ¶¶ 46–47.) She also informed Generac on September 25, 2020 that she was going to be moving to California soon and therefore "wouldn't be [t]here for very much longer anyways." (*Id.* ¶ 49.)

Andrews had difficulty getting along with her co-worker, Nancy Mooney, who often worked the first position at the Cover station while Andrews worked the second position. (*Id.* ¶ 50.) Andrews admitted that she and Mooney had interpersonal issues and had fought and yelled at one another during her employment. (*Id.* ¶ 51.) On September 28, 2020, Davis met with Verduzco to report that Andrews and Mooney had consistently been fighting on the line and screaming at one another. (*Id.* ¶ 54.) On September 30, 2020, Verduzco and Davis met with Andrews and, separately, with Mooney. (*Id.* ¶ 55.) During the meeting, Verduzco coached Andrews on needing to be able to work with others on the line, to get along with others including Mooney, and to work as a team, and explained to Andrews that she needed to act professionally in the workplace and be respectful of her coworkers. (*Id.* ¶ 56.) Andrews agrees that Verduzco and Davis set the same expectations for Mooney and directed her that she also needed to be able to work with her coworkers and get along with others. (*Id.* ¶ 61.)

Mooney explained that she did not feel safe because Andrews had threatened to throw something at her (*id.* ¶ 62) and Andrews asserts that she requested to be transferred away from Mooney on several occasions, including on September 30, 2020 (DFPOF ¶ 58

6

and Pl.'s Resp. ¶ 58). On October 5, 2020, Andrews met with Verduzco and Trja Ludeking, a Human Resources Representative, to fill out and submit an "Employee Request for Accommodation Under the Americans with Disabilities Act" form. (*Id.* ¶ 70.) On her form, Andrews stated that: "I have bipolar II disorder, just asking to not be near one coworker and I will be fine performing my job." (*Id.* ¶ 71.) Andrews was directed to bring in medical paperwork regarding her alleged Bipolar II Disorder within 15 days; however, even before receiving any medical paperwork, Generac decided to separate Andrews and Mooney. (*Id.* ¶¶ 72–73.)

On October 7, 2020 and October 14, 2020, Andrews received a Verbal Warning and Written Warning, respectively, for excessive absences and/or tardiness. (*Id.* ¶¶ 74, 76.) On October 15, 2020, Andrews sent Verduzco and Davis an email stating that she could not do Wash by herself and cannot work in an area where she cannot use the bathroom when necessary, as she needs to use the bathroom frequently due to her kidney condition. (*Id.* ¶ 82.) Andrews approached Yakich and Davis and insisted to be moved to Timing from Wash due to her alleged medical condition. (*Id.* ¶ 84.) Davis informed Andrews that she had not been given any information on any medical restrictions for Andrews from Human Resources, and that Andrews was needed on the Wash station. (*Id.* ¶ 85.) Andrews became extremely upset and Davis explained to her that if she wanted to leave she could, but if she left she would receive a half point toward her attendance record. (*Id.* ¶ 87.)

The parties dispute how Andrews left the building that night. Generac contends that Andrews yelled and swore at Davis, ripped off her Covid-19 face mask and safety googles and threw them to the ground, then stormed out of the facility at approximately 8:00 p.m. despite being scheduled to work until 1:00 a.m. (DPFOF ¶¶ 88–89.) Andrews, however,

asserts that she was "sobbing because of the pain caused to her kidneys" from the Wash station and neither yelled nor swore at Davis. (Pl.'s Resp. ¶ 88.) Andrews denies ripping her mask and glasses off; stating she took them off while she was leaving the building and dropped her glasses at her feet. (Pl.'s Resp. ¶ 89.) Andrews then sat in her car in the facility parking lot until after 9:40 p.m. (*Id.* ¶ 90.) Around 8:24 p.m., while sitting in her car, Andrews emailed Verduzco and Davis informing them that she had "left and [was] not doing this no more" and was in pain. She stated that she has Bipolar II and pyelonephritis, which she claimed can cause seizures, and accused Generac of telling her "none of that means anything." (*Id.* ¶ 91.) Verduzco responded in an email stating that at no point did Generac say it could not work with her regarding her medical conditions and Generac had been working with her as best as it could. (*Id.* ¶ 92.) She referenced the fact that, although Andrews had filled out an accommodation request, Generac was still waiting for her supporting medical documentation. (*Id.*)

Verduzco recommended to Jennifer Phillips, Senior Human Resources Manager at the Whitewater facility, that Andrews' employment be terminated. (*Id.* ¶ 96.) Phillips approved the recommendation and Generac terminated Andrews' employment on October 16, 2020. (*Id.* ¶¶ 95–96.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477

8

U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Andrews alleges that she is disabled under the ADA due to Bipolar II Disorder and pyelonephritis. She asserts that Generac violated the ADA by discriminating against her based on her disability, by failing to accommodate her disability, and by retaliating against her for opposing discrimination in the workplace. (Compl. ¶¶ 46–53.) I will address each claim in turn.

1.      *Disability Under the ADA*

As an initial matter, Generac argues that Andrews cannot establish that she is a qualified individual with a disability within the meaning of the ADA; thus, it asserts Andrews' ADA claims fail outright because she is not covered by the ADA in the first instance. (Def.'s Br. at 7–8, Docket # 23.)

Determining whether Andrews is covered under the ADA requires a brief discussion of the ADA's history. Congress enacted the ADA in 1990 to provide "expansive protections from discrimination for individuals with disabilities." *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018). Amongst its protections, the ADA prohibits discrimination against a "qualified individual on the basis of disability" regarding "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. Disability is defined, in relevant part here, as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102.

However, after years of courts—including the Supreme Court—narrowly interpreting key provisions of the ADA, Congress responded by enacting the ADA Amendments Act of 2008 ("ADAAA"). *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 221 (3d Cir. 2024). While the ADAAA did not alter the definition of disability, it contained several interpretive provisions mandating that the definition of disability be broadly construed. *Morgan*, 114 F.4th at 221; 29 C.F.R. § 1630.1(c)(4) (stating that "the definition of 'disability' in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA"). The regulations made clear that the "primary object of attention

10

in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability"; thus, the "question of whether an individual meets the definition of disability under this part should not demand extensive analysis." 29 C.F.R. § 1630.1(c)(4).

The ADAAA clarified that "substantially limits" must be construed broadly in favor of expansive coverage, and "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). It states that "major life activities" should not be "interpreted strictly to create a demanding standard for disability," and are "not determined by reference to whether it is of 'central importance to daily life.'" *Id.* § 1630.2(i)(2). The regulations further provide that when applying the principles set forth in § 1630.2(j)(1)(i) through (ix), "the individualized assessment of some types of impairments will, in virtually all cases, result in a determination of coverage" under the "actual disability" prong of the section. *Id.* § 1630.2(j)(3)(ii). The regulations provide examples of impairments that "should easily be concluded that . . . at a minimum, substantially limit the major life activities indicated," including "bipolar disorder," which "substantially limit[s] brain function." *Id.* § 1630.2(j)(3)(iii).

With that background in mind, I turn to whether Andrews' Bipolar II Disorder and pyelonephritis meet the definition of "disability" under the ADAAA. As to Bipolar II Disorder, Andrews generally asserts that her "Bipolar II Disorder substantially affects major life activities when it is exacerbated." (PPFOF ¶ 5.) She testifies, however, that her Bipolar II Disorder causes her to lose focus on work or the task at hand, lose interest in things she normally would enjoy doing; makes it difficult to think, sleep, communicate with others

11

(even her children), and care for herself; and eliminates her motivation to complete simple tasks. (PPFOF ¶¶ 5–6.) Andrews further states that she often gets anxious and has racing thoughts when her Bipolar II Disorder is exacerbated which often causes her to speak quickly (which she refers to as "word vomiting") without being able to listen to the other person. When this occurs, it is difficult for her to communicate with the other person because it "doesn't give [her] . . . the opportunity to hear what the opposing party has to say." (*Id.* ¶ 7.)

As to her pyelonephritis, Andrews testifies that she was hospitalized for four days in July 2020, just prior to starting her job at Generac, because "her kidneys were shutting down and she had 'excruciating pain on her left side.'" (PPFOF ¶ 20.) Andrews' medical records indicate that her admission diagnosis on July 13, 2020, was "acute pyelonephritis" and noted she had "[n]o prior history of pyelonephritis." (McDonald Decl. ¶ 8, Ex. F, Docket # 26-6 at 2, 10.) A CT scan of her abdomen showed findings "suspicious for left pyelonephritis with pyonephrosis[2] versus developing abscess." (*Id.* at 50.) Andrews testified that after discharge, she continued to consistently experience symptoms, including frequent and chronic urinary tract infections, dull pains, night sweats, sleeping "a lot," water retention, and nausea. (Andrews Dep. at 139.)

Given Congress' mandate to construe "disability" broadly in favor of expansive coverage, I find Andrews has met her threshold burden of establishing she is "disabled" as that term is defined in the ADA. While she does not specifically articulate what "major life activities" her impairments affect, as the regulation provides, bipolar disorder necessarily affects brain function, § 1630.2(j)(3)(iii). As to her pyelonephritis, the regulations provide

---

[2] Pyonephrosis is defined as: "Distention of the pelvis and calices of the kidney with pus, usually associated with obstruction." Pyonephrosis, Stedmans Medical Dictionary 743940.

that a "major life activity" includes the operation of a major bodily function, including bladder function. *Id.* § 1630.2(i)(1)(ii). And an "impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment." *Id.* § 1630.2(j)(1)(viii). As Andrews' two impairments both substantially limit at least one major life activity, she meets the definition of "disabled" under the statute.

I note, however, that as to Andrews' Bipolar II Disorder, the undisputed evidence establishes that Andrews' only request for accommodation was separation from Mooney, a co-worker she asserts triggers her impairment. (DPFOF ¶ 71 and Pl.'s Resp. ¶ 71.) In fact, Andrews specifically informed Generac that: "I have bipolar II disorder, just asking to not be near one coworker and I will be fine performing my job." (*Id.*) In other words, Andrews asserts that her Bipolar II Disorder does not limit her ability to work in general, only her ability to work with Mooney.

Under the pre-ADAAA law, I would confidently conclude that Andrews' Bipolar II Disorder is not a "disability" for purposes of the ADA. In *Weiler v. Household Finance Corp.*, 101 F.3d 519 (7th Cir. 1996), the court found that if a plaintiff "can do the same job for another supervisor, she can do the job, and does not qualify under the ADA." *Id.* at 525. After the amendment, but relying on *Weiler*, several courts in this circuit have similarly "rejected the argument that a person is disabled where the alleged disability is linked only to working alongside particular colleagues or supervisors in a particular job or work location." *Summers v. Target Corp.*, 382 F. Supp. 3d 842, 847 (E.D. Wis. 2019); *see also Pack v. Illinois Dep't of Healthcare & Fam. Servs.*, No. 13-CV-8930, 2015 WL 507555, at *3 (N.D. Ill. Feb. 5,

2015); *Scott v. Kaneland Cmty. Unit Sch. Dist. No. 302*, 898 F. Supp. 2d 1001, 1005–06 (N.D. Ill. 2012).

I am reticent, however, to follow suit in this case, despite the undisputed evidence linking Andrews' Bipolar II Disorder to a particular colleague. This is because while decided after the amendment, the *Summers* court does not address the broadening of the definition of disability after *Weiler*. Further, while Andrews does appear to assert that her Bipolar II Disorder affects her "major life activity" of working, amongst others, the regulations provide that "in light of the expanded definition of disability," the use of "working" as a "major life activity" will "be used in only very targeted situations." 29 C.F.R. § Pt. 1630, App. This is because, particularly "in light of the changes made by the ADA Amendments Act," "[i]n most instances, an individual with a disability will be able to establish coverage by showing substantial limitation of a major life activity other than working." *Id.* And, as previously stated, so long as an impairment substantially limits one major life activity, one need not show that it substantially limits others. *Id.* § 1630.2(j)(1)(viii).

For these reasons, I find that Andrews has established that she is an individual with a disability within the meaning of the ADA.

2.    *Disability Discrimination Claims*

The ADA defines discrimination to include both disparate treatment and failure to accommodate. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). Andrews raises discrimination claims under both theories. (Compl. ¶¶ 46–53.)

In discrimination cases, "[w]hen a defendant moves for summary judgment, the singular question for the district court is whether the plaintiff has introduced evidence that

14

would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (internal quotation and citations omitted). This same legal framework applies to claims arising under the ADA. *See Aberman v. Bd. of Educ. of City of Chicago*, 242 F. Supp. 3d 672, 686 (N.D. Ill. 2017) (applying *Ortiz* framework to ADA claim). "Whether a plaintiff offers direct or circumstantial evidence of discrimination, this court made clear in *Ortiz v. Werner Enters., Inc.* that 'all evidence belongs in a single pile and must be evaluated as a whole.'" *Igasaki*, 988 F.3d at 957 (citing *Ortiz v. Werner Enters.*, 834 F.3d 760, 766 (7th Cir. 2016)).

However, "[o]ne way of proving employment discrimination . . . remains the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)." *Igasaki*, 988 F.3d at 957. "The familiar *McDonnell Douglas* approach requires a plaintiff to make a *prima facie* case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Id.* (internal quotation and citation omitted).

To make a *prima facie* case under *McDonell Douglas*, a plaintiff must show: (1) she belongs to a protected class; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) another similarly situated employee outside of her protected class received better treatment from her employer. *Id.* "But a plaintiff need not use the *McDonell Douglas* framework after *Ortiz*." *Id.* At summary judgment, "[w]hat matters is whether [a plaintiff] presented enough evidence to allow the jury to find in [his] favor." *Id.* at 957–58 (alternations in original).

15

### 2.1    Disparate Treatment Claim

A claim for disparate treatment based on disability under the ADA requires proof that: (1) the plaintiff was disabled; (2) the plaintiff was qualified to perform essential functions with or without reasonable accommodation; and (3) the disability was the "but for" cause of the adverse employment action. *Scheidler*, 914 F.3d at 541. I have already found that Andrews was disabled under the ADA. Thus, I must determine whether Andrews has introduced sufficient evidence to permit a reasonable jury to find she meets the remaining two elements of her disparate treatment claim.

### 2.1.1    Whether Andrews Was Qualified to Perform the Job With or Without Reasonable Accommodation

Andrews worked as an Assembler I during her tenure at Generac. (DPFOF ¶ 28 and Pl.'s Resp. ¶ 28.) Andrews does not dispute that as an Assembler I, she was required to: cross-train in multiple assembly areas and be available to work in other similar departments based on business necessity; follow established procedures, processes, and policies; demonstrate good attendance, quality, and attention to detail and all safety policies; effectively communicate in a team environment; and accept responsibility for her own actions. (*Id.* ¶ 29.)

Andrews argues that Generac concedes that she was not terminated for a lack of qualifications. (Pl.'s Resp. Br. at 7.) She asserts that she performed her job well and was never criticized for her performance. (*Id.*) However, as stated above, the Assembler I position required more than the ability to perform the physical work of the job, it included effectively communicating with others in a team environment and demonstrating good attendance. (DPFOF ¶ 29 and Pl.'s Resp. ¶ 29.) The undisputed evidence shows that

16

Andrews failed to meet either of these criteria. As for effectively communicating with others on her team, Andrews does not dispute that she did not get along with her colleague, Mooney, whom she was partnered with on the Cover station. (*Id.* ¶¶ 50–54.) She agrees that she fought and yelled at Mooney while at work. (*Id.*) Further, Andrews agrees that she made Mooney feel unsafe because she threatened to throw something at her. (*Id.* ¶ 62.) An employer need not tolerate an employee's unacceptable behavior, and "'the fact that that behavior was precipitated by a mental illness does not present an issue under the Americans with Disabilities Act.'" *Rocchio v. E&B Paving, LLC*, No. 20CV00417, 2022 WL 972762, at *3 (S.D. Ind. Mar. 31, 2022) (quoting *Palmer v. Circuit Ct. of Cook Cnty.*, 117 F.3d 351, 352 (7th Cir. 1997)).

As for attendance, Andrews agrees that on October 7, 2020, she received a verbal warning for excessive absences and/or tardiness and does not dispute that she was either absent or tardy on the days listed. (*Id.* ¶¶ 74–75.) It is also undisputed that on October 14, 2020, Andrews received a written warning for excessive absences and/or tardiness. (*Id.* ¶ 76.) "An employer is generally permitted to treat regular attendance as an essential job requirement and need not accommodate erratic or unreliable attendance." *Basden v. Pro. Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) (internal citations omitted).

Furthermore, Andrews does not dispute that in September 2020, Generac mandated that all employees in Andrews' position would need to begin working mandatory Saturdays and Andrews refused to do so for reasons unrelated to her alleged disabilities or medical conditions. (*Id.* ¶¶ 45–47.) Even if it was her disabilities, however, preventing her from working mandatory Saturdays, she would be unable to perform an essential function of the Assembler I job. *See Basden*, 714 F.3d at 1037 ("A plaintiff whose disability prevents her

17

from coming to work regularly cannot perform the essential functions of her job, and thus cannot be a qualified individual for ADA purposes."). For these reasons, the undisputed evidence shows that Andrews was unqualified to perform the job, with or without reasonable accommodation, as a matter of law.

### 2.1.2 Whether Andrews' Disabilities Were the "But For" Cause of Her Termination

Even assuming, *arguendo*, that Andrews could demonstrate that she was qualified to perform the job, she cannot demonstrate that she was terminated because of her alleged disabilities. Generac states that Andrews was terminated because she walked off her shift on October 15, 2020, without authorization, was insubordinate, and left the facility by "aggressively throwing off her mask and safety glasses." (DPFOF ¶ 97.) Andrews argues that Generac's stated reasons for terminating her employment were pretextual. (Pl.'s Resp. Br. at 11–13.)

A "plaintiff demonstrates pretext by showing the employer's proffered nondiscriminatory reason is a lie and the real reason is based on discriminatory intent." *Hobbs v. City of Chicago*, 573 F.3d 454, 462 (7th Cir. 2009). Andrews argues that credible evidence exists to demonstrate that she was terminated because of her disabilities and for opposing discrimination in the workplace. (Pl.'s Resp. Br. at 11–12.) Specifically, she argues that Verduzco told her she was being terminated for her "erratic behavior." (PPFOF ¶ 70.) Andrews further disputes that she "threw" her safety glasses and mask before leaving the building on October 15, 2020; stating that she took both off right before she was about to walk out the door and merely "let [her safety glasses] go down in front of her like right at her feet." (PPFOF ¶ 77.) Andrews further argues that others in the facility would take off

18

their masks and safety glasses without discipline, including her supervisor, Davis. (Pl.'s Resp. Br. at 12–13.)

As to the October 15, 2020, incident precipitating her termination, she acknowledges that she left her shift "a bit early" that day, but states that it was due to her extreme kidney pain and that she informed her direct supervisor as such. (PPFOF ¶¶ 72–73.) Andrews argues that she had been "steadfast in her requests for accommodation" and Generac "balked at her requests"; thus, "Generac took what it believed was the easy way out by severing her employment." (Pl.'s Resp. Br. at 13.)

The undisputed evidence does not support Andrews' version of events. While Andrews asserts that despite being "steadfast" in her requests for accommodation, Generac simply "balked" at her requests, the record indicates otherwise. Andrews does not dispute that Generac directed her to provide medical paperwork regarding her Bipolar II Disorder within 15 days of completing her ADA accommodation request form and Andrews never provided the requested paperwork. (DPFOF ¶¶ 72–73 and Pl.'s Resp. ¶¶ 72–73.) Despite the lack of paperwork, Generac granted Andrews' sole request for accommodation, to be moved away from Mooney. (*Id.* ¶¶ 71, 73.)

As for her pyelonephritis, Andrews testified that she believed she was terminated "due to [her] pyelonephritis on the last three days that I worked there." (Andrews Dep. at 106.) Andrews' issues with pyelonephritis allegedly arose when she was moved to the Wash station on October 13, 2020. (DPFOF ¶ 118 and Pl.'s Resp. ¶ 118.) Andrews asserts that she requested to be moved from the Wash station to the Timing station because it "took a toll on her body" because she had to lift parts that were approximately 25-30 pounds. (*Id.*) Andrews alleges that at the Wash station, she was not allowed to use the bathroom as

19

needed because two people were required to perform the job and there was no one to cover her. (PPFOF ¶¶ 58–59.)

Andrews, however, did not inform Generac of the negative impact working on the Wash station had on her kidney condition until October 15, 2020. On October 14, 2020, while Andrews texted Yakich asking if she could ask Davis if Andrews could be moved to Timing, she does not mention her kidney condition. Rather, she requests the move because "I'm really good at it, and I mean I like the wash but I really like doing timing." (Declaration of Suzanne M. Watson ("Watson Decl.") ¶ 5, Ex. D, Docket # 19-4 at 1.) It was not until October 15, 2020, at 10:59 a.m., that Andrews alerted her employer that the assignment to Wash affected her kidney issues. Specifically, Andrews emailed Davis and Verduzco stating that she cannot do Wash by herself because she has "kidney failure and need to relieve myself pretty much instantly." (Declaration of Jennifer Phillips ¶ 12, Ex. F, Docket # 20-1 at 43.) She further stated that "I would prefer not to do wash at this time until two people can be there all night, like I said before, I'm great at timing and I would prefer to be there and only there." (*Id.*) Then, Andrews texted Davis at 6:40 p.m., just before her shift, stating that she had "a legit medical issues" and is "over working [her] kidneys" so can she "please be put on timing." (McDonald Decl. ¶ 3, Ex. I, Docket # 26-9.)

Under the ADA, after an employee informs her employer of her disability, it triggers the employer's responsbility to engage with the employee in an "interactive process" to determine the appropriate accommodation under the circumstances. *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998). Andrews, however, did not give Generac the opportunity to engage in the interactive process. Andrews does not dispute that she walked out of her shift on the same day she informed Generac that the Wash station negatively

20

impacted her kidney condition. (DPFOF ¶ 88 and Pl.'s Resp. ¶ 88.) And although she asserts that she left early because she was "in so much pain," she "couldn't take it," and "needed to get to a hospital" for her pyelonephritis, (*id.* ¶ 132), Andrews does not dispute that she did not go to the hospital after leaving her shift early that night, but instead sat outside the facility in her car for nearly two hours (*id.* ¶ 133). Andrews then emails Verduzco at 12:20 a.m. asking if she's "not fired" whether she could take the next two days off as bereavement days for the four-year anniversaries of losing her daughter and grandmother. (Docket # 20-1 at 45.)

Given the undisputed facts, no reasonable jury could find that Generac's purported explanation for Andrews' October 16, 2020 termination was pretextual. The evidence demonstrates that as to her Bipolar II Disorder, Generac did implement Andrews' requested accommodation, despite her failure to provide medical documentation of her condition. And as to her pyelonephritis, Andrews did not inform Generac that Wash was affecting her kidney condition until the day she walked out of her shift early. Her initial text message to Yakich mentions nothing about her alleged kidney condition when she asks to be moved to Timing, simply stating that she prefers it.

At bottom, Andrews contends that she walked out of her shift five hours early due to extreme kidney pain and her termination the next day was not due to her insubordination that night, but because of her disability. But again, the evidence shows that not until the day Andrews walked out on her shift does she alert Generac that she cannot work on Wash due to her kidney issues. And after walking out of her shift, she spends the next several hours sitting in her car outside the facility emailing management rather than seeking medical treatment. Most tellingly, Andrews then emails Verduzco around midnight that night asking

for the next two days off—if she still has a job. And the reasons Andrews gave for this last-minute time-off request were unrelated to the alleged kidney condition she contends was so severe she needed to leave her shift five hours early. These undisputed facts support Generac's purported reasons for terminating Andrews the next day was not due to any alleged disability. Thus, Andrews' disparate treatment claim fails.

### 2.2 Failure to Accommodate Claim

Andrews also argues Generac discriminated against her by failing to accommodate her disabilities. A claim for failure to accommodate under the ADA requires proof that: (1) the plaintiff was a qualified individual with a disability; (2) the defendant was aware of her disability; and (3) the defendant failed to accommodate her disability reasonably. *Scheidler*, 914 F.3d at 541.

As to her Bipolar II Disorder, as stated above, it is undisputed that Andrews' requested accommodation was to be moved away from Mooney, and Generac provided this accommodation. Thus, Generac did not, as a matter of law, fail to reasonably accommodate her bipolar disability.

As to her kidney condition, Andrews contends that she requested an accommodation in the form of being moved from the Wash station to Timing. (Andrews Dep. at 168.) Andrews acknowledges, however, that despite moving to Wash on October 13, 2020, it was not until October 15, 2020, that Andrews alerted her supervisors that the Wash station negatively impacted her kidney condition. Rather, she asked Yakich to move her from Wash to Timing on October 14, 2020, because she preferred Timing over Wash. (Docket # 19-4 at 1.) And although Andrews asserts that several of her co-workers told Davis on October 14 and 15 that they were willing to switch positions with Andrews so she would not

have to work Wash and Davis refused the offers (Andrews Dep. at 169), these hearsay statements from unnamed co-workers are insufficient to create an issue of fact to preclude summary judgment, *see MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011) ("A party may not rely on inadmissible hearsay to avoid summary judgment."). For these reasons, Andrews cannot show that Generac failed to accommodate either of her alleged disabilities. As such, her failure to accommodate claim fails.

3.     *Retaliation Under the ADA*

Lastly, in her complaint, Andrews alleges that Generac retaliated against her for opposing discrimination in the workplace. (Compl. ¶¶ 46–53.)

The ADA prohibits an employer from retaliating against an individual because she opposed any act or practice made unlawful by the ADA or because she made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the ADA. 42 U.S.C. § 12203(a). To succeed on a retaliation claim under the ADA, a plaintiff must show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two. *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022). Further, "[e]mployers are forbidden from retaliating against employees who raise ADA claims regardless of whether the initial claims of discrimination are meritless." *Koty v. DuPage Cnty., Illinois*, 900 F.3d 515, 519 (7th Cir. 2018) (internal quotation and citation omitted).

If a plaintiff satisfies her initial burden on the retaliation claim, the burden then shifts to the defendant to present a "non-invidious" reason for the adverse employment action. *Id.* If the defendant meets this burden, the plaintiff must then demonstrate that the defendant's proffered reason was pretextual. *Id.* Pretext involves more than just faulty reasoning or

23

mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action. *Id.*

Despite raising a retaliation claim in her complaint, Andrews does not oppose Generac's contention that her retaliation claim fails as a matter of law. (Def.'s Br. at 25–28; Def.'s Reply Br. at 14, Docket # 28.) Thus, given her silence on the issue, I conclude that she concedes that this claim fails as a matter of law. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument—as the Bontes have done here—results in waiver."). Furthermore, despite being the non-movant, Andrews retains her burden of producing evidence which would support a reasonable jury verdict. *See Celotex Corp.*, 477 U.S. at 324. Thus, even if I were to reach the merits of Andrews' retaliation claim, for the reasons explained above, Andrews cannot demonstrate a causal connection between any protected activity and her termination. For these reasons, summary judgment in favor of Generac is granted on Andrews' retaliation claim.

## CONCLUSION

Andrews sues her former employer, Generac, alleging that she was discriminated and retaliated against based on her alleged disabilities of Bipolar II Disorder and pyelonephritis under the ADA. I find that based on the undisputed evidence in the record, a rational trier of fact could not find in favor of Andrews on her ADA claims. Thus, summary judgment is granted in favor of Generac. Andrews' complaint is dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that Defendant's Motion for Summary Judgment (Docket # 17) is **GRANTED**.

**IT IS FURTHER ORDERED** that this case is dismissed. The clerk of court will enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 13th day of December, 2024.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge